HUNT-BERLIN COAL CO. *et al. v.* S. B. PATON.

(*Jackson.* April Term, 1918.)

1. **MASTER AND SERVANT.** Injury to third person. Scope of employee's duty.

It was outside the scope of the duty of a yardmaster of a coal company in admitting an employee of a light company to inspect a meter to engage in a dispute with him relative to the demerits of their respective employers in course of which he was provoked into killing the inspector, and, on these facts appearing in an action for his death, the coal company was entitled to a peremptory instruction. (*Post, p. 616.*)

Cases cited and approved:  Turbeville v. Stampe (1698), Comb., 459;  Nicholson v. Mounsay, 15 East, 384;  Puryear v. Thompson, 24 Tenn., 397;  Cantrell v. Colwell, 40 Tenn., 470;  Smith v. Memphis & Packet Co., 3 Tenn. Cas., 265;  Stone Co. v. Pugh, 115 Tenn., 688;  Knoxville Traction Co. v. Lane, 103 Tenn., 379;  Eichengreen v. Railroad, 96 Tenn., 229;  Railroad v. Carter, 129 Tenn., 463;  Terry v. Burford, 131 Tenn., 451;  Memphis Street R. Co. v. Stratton, 131 Tenn., 620;  Nashville & C. R. Co. v. Starnes, 56 Tenn., 52;  Daniel v. Petersburg R. Co., 117 N. C., 592;  Bowen v. Illinois Cent. R. Co., 136 Fed., 306;  Johanson v. Pioneer Fuel Co., 72 Minn., 405;  Fairbanks v. Boston Storage Co., 189 Mass., 419.

Cases cited and distinguished:  McManus v. Crickett, 1 East., 107;  Texas & Pac. R. Co. v. Scoville, 62 Fed., 730;  Rounds v. Delaware, etc., R. Co., 64 N. Y., 129.

2. **DEATH.** Self-defense. Question for jury.

In an action for wrongful death, evidence as to self-defense, *held* to present a question for the jury. (*Post, p. 622.*)

3. **DEATH.** Self-defense. Law governing.

The law of self-defense in a civil suit is the same as that governing in criminal prosecutions, except that the cause must be de-

cided on a preponderance of testimony, whereas in criminal prosecutions defendant is entitled to the benefit of a reasonable doubt. (*Post, p.* 622.)

**4. DEATH. Wrongful death. Burden of proof.**

In an action for wrongful death due to an intentional act, the burden is on plaintiff first to establish his case by sufficient proof, but defendant has the burden of sustaining a plea of self-defense. (*Post, p.* 622.)

Cases cited and approved: Brooks v. Haslam, 65 Cal., 421; Suell v. Derricott, 161 Ala., 259; Nichols v. Winfrey, 79 Mo., 544; Rutherford v. Foster, 125 Fed., 187.

**5. DEATH. Wrongful death. Self-defense. Instructions.**

In an action for wrongful death defended on the ground of self-defense, the court charged that, if the jury should find defendant was not in peril, and it was unnecessary to fire to protect himself, still, if they should find that the situation or happenings were such as to lead a prudent and cautious man to believe he was in danger, even though he were not, the law would not hold him liable. *Held* that failure to prefix the word "reasonably" to the words "prudent and cautious" therein was reversible error, as placing an undue burden on defendant. (*Post, p.* 623.)

**6. DEATH. Wrongful death. Self-defense. Instructions.**

In an action for death defended on the ground of self-defense, a statement in the charge that, if decedent did not make the assault on defendant which led him necessarily and reasonably to believe that his life was imperiled, or that he was in danger of great bodily harm, he had no right to fire, was erroneous in using the word "necessarily" as conveying to the minds of the jurors the fact that defendant was not warranted in shooting until circumstances were such as to compel him to believe his life was imperiled. (*Post, p.* 624.)

FROM SHELBY.

Appeal from the Circuit Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—A. B. PITTMAN, Judge.

McGEHEE, LIVINGSTON & FARABOUGH, for plaintiff.

ANDERSON & CRABTREE, for defendants.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This is an action to recover for the alleged wrongful death of R. L. Paton, in which the Hunt-Berlin Coal Company and one of its employees, W. R. Morehead, are defendants. The deceased was shot and killed by Morehead.

His personal representative procured a favorable verdict and judgment against both defendants, but on appeal the court of civil appeals held that the trial judge should have sustained a motion for peremptory instructions in behalf of the coal company, that a like motion of defendant Morehead was properly overruled, but that there was reversible error in the charge of the court as to Morehead. All parties have petitioned for *certiorari*, complaining of rulings adverse to them in assignments of error.

The facts appear to be as follows:

The coal company was engaged in selling coal, and Morehead was in its employ, as manager of the particular yard at which the trouble with Paton occurred, having full general control also of the lights and the

meters used at that yard, though, according to More-head's testimony, only to the extent of giving access to those who might have occasion to go in.

Paton was in the employ of the light company, and charged with the duty of inspecting all meters and seeing that they were kept in running condition. The coal company used two of the meters of Paton's employer. Paton went to the plant of the coal company to inspect one of these meters and on making known his business, Morehead opened the door of the building where the meter was located and let him into the building. Morehead says that he then asked Paton if there was anything wrong with the meter, observing that a man was sent there every few days; whereupon Paton began to curse, and asked, "What have you got to do with it?" and saying further, "I believe you coal men think we are thieves like all of you coal s— of b—s," in reply to which Morehead said, "I did not come down here to have trouble with you; I don't know anything about you being a thief; I know I am not." Paton then said to him, "Shut up, you black-faced s—— of a b——; you don't know me; I am a Scotchman; I will kill you; I have got a gun; I will kill you;" at which time Morehead turned and walked away, meaning to go to the office to call up the Light Company, and have the meter taken out. He left Paton still working on the meter, and was not expecting him to follow. While he was on his way to the office, however, he heard some one talking behind him, and on glancing around he saw Paton approaching

him running, and then within ten feet of him. When Paton got opposite Morehead, he turned facing Morehead and threw his own hands to his hip pocket, saying, "You black-faced s—— of a b——, I will kill you now," drawing something out of his pocket. This was a meter seal. Morehead testifies that, thinking Paton had a pistol he fired in what he thought was his own self-defense.

There was sent up, as a part of the record, a tool that Morehead says Paton drew, and which he took to be a pistol, which tool, while not greatly resembling a pistol, is of such character as led the court of civil appeals to hold that it was a question for the jury as to whether one would be led, under the circumstances indicated, to so believe. According to the evidence of Morehead, he ceased shooting on Paton's falling, and this is not contradicted.

Morehead testified that he had done nothing more to provoke the trouble; that he was followed by Paton about four hundred feet from the place where the meter was being inspected by Paton.

According to the testimony of a policeman, after Paton was taken to a hospital he made statements as to how the trouble occurred, which corroborated the testimony of Morehead. The policeman testified that Paton, while in the hospital, explained to him that Morehead might have thought that he (Paton) had a "gun," that he in fact had what he called a sealing iron, and also told him that he (Paton) applied vile epithets to Morehead.

Another witness says that Morehead told him, "That man (referring to Paton) had a gun on him," and that on searching Paton he found on the ground by him the tool referred to, describing it as shiny.

1. As to the petition of the administrator of the deceased:

On the above facts it is contended that the court of civil appeals erred in sustaining the motion for a directed verdict favorable to the coal company, since the dispute and killing was not about the private affairs of those engaged, but about the affairs of their respective employers, and the trouble first arose while Morehead was, it is urged, in the line of his duty at the meter. It is said that when he shot he had the interests of the coal company in mind, and was going to the telephone in furtherance of those interests.

An early conception of common-law judges of the true test of the master's liability for a servant's tort was that of a direct command or direction to do the act; but later this was modified. Lord Holt, who became Chief Justice during the English Revolution of 1688, is said to have been largely instrumental in bringing this about, by discarding that part of the doctrine which required a particular command as the test of liability, and exhausted the rule so as to include the notion of implied or presumed command. *Turbeville* v. *Stampe* (1698), Comb., 459. He laid down the rule that, where the master sets his servant to prosecute a particular enterprise, he impliedly authorizes the doing of all acts which are reasonably

necessary in accomplishing the end aimed at.   The change to constructive command thus wrought in the law of torts was more clearly demarked during the chief justiceships of Lords Kenyon and Ellenborough, and ''scope of employment'' phrased the general test. *Nicholson* v. *Mounsay,* 15 East, 384.

When, however, it came to dealing with willful torts of servants, Lord KENYON, in *McManus* v. *Crickett,* 1 East, 107, an action for driving a chariot against the plaintiff's chaise, ruled that a master is not liable for the willful act of his servant, done without the direction or assent of the master, thus reverting to the old doctrine of particular command in cases involving willful torts.   It was said by him:

''It is a question of very general concern, and has been often canvassed, but I hope at last it wil be at rest.   .   .   .   When a servant quits sight of the object for which he is employed, and without having in view his master's orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him, and his master will not be answerable for such acts.''

According to the rule of the earlier American cases, which follow *McManus* v. *Crickett,* supra, although a master was liable for a servant's tortious act in the scope of his employment, he was not liable for such acts if they were committed by his servant willfully or maliciously, unless the master had ordered or directed them or subsequently adopted or ratified same.   This view was based on the theory that when

a servant commits a willful act he is not acting within the scope of his employment. The dividing line was the willfulness of the act.

This earlier doctrine has now been discarded in nearly every jurisdiction and held to be fallacious in that it makes the mental attitude of the tort-feasor in an act of design the test by which to determine whether he was acting within the scope of his authority from the master.

In *Texas & Pac. R. Co.* v. *Scoville,* 62 Fed., 730, 10 C. C. A., 479, 27 L. R. A., 179, it was said:

"Strong as was Lord Kenyon's hope that he had put the question at rest, and reluctant as have been Westminster Hall and the courts of last resort in this country to pass the line he set to terminate the master's liability, an examination of the cases shows that the most enlightened and conservative courts no longer hold that willful and malicious purpose is prima facie a departure from the master's business."

How far the former doctrine may have entered into, and how far, if at all, it deflected unduly the course of decision in our early cases of *Puryear* v. *Thompson,* 5 Humph. (24 Tenn.), 397, *Cantrell* v. *Colwell,* 3 Head (40 Tenn.), 470, and *Smith* v. *Memphis & Packet Co.,* 3 Tenn. Cas., 265, we need not stop to inquire. See *Stone Co.* v. *Pugh,* 115 Tenn., 688, 91 S. W., 199, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881.

We believe, however, that the later decisions in this and other jurisdictions, aside from some that are erratic, holding that the willful tort of the servant

may be imputed to the master, may be grouped into three classes:

(a) Where the master is under contract, expressed or implied, with the person wronged, or under a law-imposed duty, requiring the master to refrain from mistreatment of him. Into this class fall, for example, assaults upon passengers by railway employees. *Knoxville Traction Co.* v. *Lane,* 103 Tenn., 379, 53 S. W., 557, 46 L. R. A., 549, and cases in accord.

(b) Where the nature of the employment or the duty imposed on the servant is such that the master must contemplate the use of force by the servant in performance, as a natural or legitimate sequence. Illustrating this class are cases involving assault and homicides by special officers in the master's employ (*Eichengreen* v. *Railroad,* 96 Tenn., 229, 34 S. W., 219, 31 L. R. A., 702, 54 Am. St. Rep., 833; *Railroad* v. *Carter,* 129 Tenn., 463, 166 S. W., 593; *Terry* v. *Burford,* 131 Tenn., 451, 175 S. W., 538, L. R. A., 1915F, 714); assaults by guards employed to protect the master's property (*Memphis Street R. Co.* v. *Stratton,* 131 Tenn., 620, 176 S. W., 105, L. R. A., 1915E, 704); trainmen protecting their trains from trespassers; servants sent to repossess or take property. It is generally held in such circumstances that the master will be liable though the wrong be done by means of a deadly weapon in the hand of the servant.

(c) Where a dangerous instrumentality is intrusted by the master to the servant, which has capability of harm to the public. Illustrating this class is *Nash-*

*ville & C. R. Co.* v. *Starnes,* 9 Heisk. (56 Tenn.), 52, 24 Am. Rep., 297, which involved a locomotive whistle willfully sounded.

It may be that in the development of the law of torts other cases may arise which would call for a distinct classification.

The cases relied upon by the petitioner fall under one of the above heads, when at all sound. *Daniel* v. *Petersburg R. Co.,* 117 N. C., 592, 23 S. E., 327, 4 L. R. A. (N. S.), 485, so relied upon, was justly criticized in *Bowen* v. *Illinois Cent. R. Co.,* 136 Fed., 306, 69 C. C. A., 444, 70 L. R. A., 915, and is said by Labatt to be opposed to the general current of authority. 6 Labatt, Mas. & Serv., section 2368a.

The facts of the pending case do not bring it within either of the groups. Morehead was not a guard, and his use of force was something that his employer cannot be held to have fairly had in anticipation.

In *Rounds* v. *Delaware, etc., R. Co.,* 64 N. Y. 129, 21 Am. Rep., 597, it was said:

"The master is liable only for the authorized acts of the servant, and the root of his liability for the servants' acts is his consent, express or implied, thereto. . . .

"It seems to be clear enough from the cases in this state that the act of the servant causing actionable injury to a third person does not subject the master to civil responsibility in all cases where it appears that the servant was at the time in the use of his master's property or because the act, in some general

Hunt-Berlin Coal Co. v. Paton.

sense, was done while he was doing his master's business, irrespective of the real nature and motive of the transaction. . . .

"If he is authorized to use force against another when necessary in executing his master's orders, the master commits it to him to decide what degree of force he shall use; and if, through misjudgment or violence of temper, he goes beyond the necessity of the occasion, and gives a right of action to another, he cannot, as to third persons, be said to have been acting without the line of his duty, or to have departed from his master's business."

In *Johanson* v. *Pioneer Fuel Co.*, 72 Minn., 405, 75 N. W., 719, one employed by the defendant to sell coal assaulted a purchaser who came to defendant's place of business. The dispute arose from the employee charging that the prospective purchaser brought sacks too large in an attempt to get more coal than he was entitled to. This the customer denied, whereupon the employee became enraged and assaulted and beat the customer. It was held that in so doing the employee was not acting within the scope of his employment. See, also. *Fairbanks* v. *Boston Storage Co.*, 189 Mass., 419, 79 N. E., 737, 13 L. R. A. (N. S.), 422, 109 Am. St. Rep., 646.

In the instant case, if that were material, the dispute that led to the homicide was not over any defect in the meter, but one in relation to the relative demerits of the employers of the disputants; and it was in no way within the scope of Morehead's employment to

engage in a debating match, garnished with profanity, or to settle by force the question of the probity or fair dealing of the coal company.

We hold that no error was committed in sustaining the Coal Company's motion for peremptory instructions. While, generally speaking, the question whether the act of a servant is within the scope of his duty is one for the jury, it becomes one for the court in a case such as this.

2. As to the assignments of error unler the petition of Morehead, the servant:

It is the insistence of this petitioner that his motion for an instructed verdict should have been sustained because the facts show that he acted in his necessary self-defense.

The law of self-defense applicable in a civil suit is the same as that governing in criminal prosecutions, with the exception that in a civil action the cause must be decided on a preponderance of testimony, whereas in a criminal prosecution the defendant is entitled to the benefit of a reasonable doubt in respect to the defense. 8 R. C. L., p. 779, and authorities cited; 5 C. J., 635.

In an action to recover damages for wrongful death due to an intentional act, the burden of proof is on the plaintiff first to establish his case by sufficient proof; but when there is a plea of self-defense the burden of proof is on the defendant to sustain the plea. *Brooks* v. *Haslam,* 65 Cal., 421; *Suell* v. *Derricott,* 161 Ala., 259, 49 South., 895, 23 L. R. A. (N. S.), 996, 18 Ann. Cas., 636, and note; 8 R. C. L., p.

858. A contrary rule in Missouri which puts the burden on the plaintiff to show that the homicide was not justifiable (*Nichols* v. *Winfrey*, 79 Mo., 544) stands alone, and is severely and justly criticized in *Rutherford* v. *Foster*, 125 Fed., 187, 60 C. C. A., 129, as obnoxious to a wise and fair administration of justice.

The court of civil appeals ruled, and we think correctly, that the jury was warranted in finding that the sealing iron did not so nearly resemble a pistol as to mislead Morehead. Further, we think the jury may have drawn the inference that Morehead saw Paton at work with that tool at the meter just prior to the shooting. Under the facts the validity of the plea of self-defense was for the jury; and we cannot say that there was no evidence to support its finding of liability on Morehead's part, under the above rules applicable in civil action.

3. As to the assignments of error of the administrator relating to the ruling on the trial judge's charge:

The court of civil appeals held to be reversible error this paragraph in the charge because of the use of the words "prudent and cautious:"

"Even if the jury should find that Morehead was not in peril and that it was not necessary for him to fire in order to protect himself, still, if the jury should find the facts to be that the situation or happenings were such as to lead a prudent and cautious man to believe that he was in danger, even though

he were not, the law would not hold him liable for firing the shot.''

We believe this ruling of the appellate court to be correct. The charge placed an undue burden on Morehead in respect of his defense in not qualifying the indicated words by prefixing the word ''reasonably.''

The appellate court further held that defendant Morehead was prejudiced by this statement in the charge:

''But if the jury finds that Paton was not making an assault on Morehead which led Morehead necessarily and reasonably to believe that his life was imperiled or that he was in danger of having great bodily harm inflicted upon him, then he had no right to fire.''

The use of the word ''necessarily'' was erroneous; it conveyed to the minds of the jurors the thought that Morehead was not warranted in shooting until the circumstances were such as to compel him to believe that his life was in peril.

It is by no means improbable that the jury would have found in Morehead's favor but for these two paragraphs in the charge.

There being no error, the judgment of the court of civil appeals is affirmed, with a remand for a new trial as to defendant Morehead.