BARKER v. ELDER et al.—97 S. W. (2d), 654.

Eastern Section. August 1, 1936.

Petition for Certiorari denied by Supreme Court, October 3, 1936.

Thomas S. Myers, of Chattanooga, L. H. Myers, of Fayetteville, Raulston & Raulston, of South Pittsburgh, and Thach & Thach, of Chattanooga, for plaintiffs-in-error.

Swafford & Woodlee, of Dayton, Lewis S. Pope, of Nashville, and Walter H. Cheers, of Dayton, for defendant-in-error.

PORTRUM, J. The plaintiff's intestate, Mabel B. Myers, widow, forty-one years of age, was struck and killed by an automobile operated by the defendant's servant, upon the street of the town of Pikeville, Tenn., on the 23d of January, 1935. The defendant E. N. Keith, being the master of the driver of the automobile, was sued as the responsible party and answerable for the negligence of the servant. The defendant's defense is that at the time of the accident his servant had stepped aside from his employment and was

upon a mission of his own, and since he was not acting for the master, the master is not responsible 'for his negligence.

It is agreed that the servant, John Elder, had at one time stepped aside and performed a mission of his own, but the plaintiff insists that he had performed the mission and had resumed his service at the time of the accident, while the defendant insists that he had not returned to his employment and resumed his duties at the time of the accident. The facts present a novel situation that is difficult of solution and quite baffling, and only by a critical analysis of the concomitant rights and duties of all the parties throughout the time involved can a solution be found and a satisfying decision rendered. The servant Elder in operating the automobile never left his route, but undertook without authority from his master to transport two of his friends from Lee's Station to Pikeville and to return them to Lee's Station. The plaintiff insists that the servant stepped aside and entered a mission of his own when he took on the passengers at Lee's Station, and when he returned them to Lee's Station he had resumed the employment to his master and the accident occurred as the servant returned to Pikeville. The defendant insists that the servant first abandoned his duties to his master, and entered purely a mission of his own when he quit the duties of his employment in Pikeville and started upon his return with the passengers to Lee's Station, and his employment could not be resumed until he had returned to Pikeville, the place where he was called upon to perform duties for the master.

The defendant Keith lives at Dayton, the county seat of Rhea county, situated in the Tennessee Valley, 40 miles north of Chattanooga; Pikeville lies in Sequatchie Valley, eighteen miles to the west of Dayton, and across Waldon's Ridge, and the towns are connected by highway No. 30, which forms a junction with highway No. 37 at the south edge of Pikeville and highway No. 37 runs north and south through the Sequatchie Valley. South of Pikeville and in the adjoining county is the county seat of Dunlap, and a few miles south of Dunlap is Daus Station, and at this point the servant had gone to load potatoes. On the day before the accident the servant had been at this station arranging to load the potatoes, and he expected his master, Mr. Keith, to accompany him on the following day. Mr. Keith was sick and unable to accompany his servant, so he directed him to go to Pikeville and pick up certain parties to aid him in grading and loading the potatoes, and then continue to Daus Station and perform his duties. The servant's narration of what he did after he had assumed his duties is here quoted:

"I went back the next morning but Mr. Keith said he was not able to go, he was in bed sick, and wanted me to go back to finish the car of potatoes. I got the car out of the garage and came on

over. Mr. Keith told me if I thought I could not get it out to pick up three or four good graders at Pikeville and take them down there. I got Lester Graham and his wife, brother and sister-in-law and Martin Ferguson, and we went down and finished out the car of potatoes that day. This was on the day of the accident. I think we got the car loaded about two or three o'clock—After the car was loaded we went back to Dunlap and billed the potatoes from there. We then went back to Daus Station as we had some hampers and I went back to count them. I counted the hampers and then came back up the valley, stopping at Lee's Station which is called five miles south of Pikeville. We did not stay there very long, maybe ten or fifteen minutes. The Grahams and Martin Ferguson were with me. From Lee's Station we went to Pikeville. Mitchell Summers and Mr. Narramore were with us" (the last-named two are the passengers). "I picked Summers and Narramore up at Lee's Station and went to Pikeville where Hazel Graham and Ruby Simms, her sister, got out at Graham's house and the others went to the potato house and we stayed there a few minutes and then I took these two men back to Lee's Station. I then returned to Pikeville and stopped at Graham's house and Mr. Graham, Chester, got out and Mr. Ferguson's little boy came out and got in the car with us, we told him we were going to the potato house and we started. I don't know who the house belonged to, but Mr. E. N. Keith was running it I suppose. Where Graham got out is called South Pikeville. This was before I got to the public square. When I left Grahams I took the main road up the valley—don't know the name of the street. I stopped at the Curtis restaurant and ordered some sandwiches but didn't get them. He was to fix them and I told him I would get them as I came back by. I then went to the potato house to count the sweet potatoes and get a check in the hampers. It was my job to count the hampers as Mr. Keith had told me to. I did not count them when I was there before because I had two boys up there and there is another potato house right across the street and there is a crowd there all the time, and about the time I opened the door a crowd runs in and I wanted to get the crowd out of the way so they would not get me messed up counting them.

"My car was pinting up the valley and I turned to the left when I started to the potato house. I was still driving Mr. Keith's car, or the car he turned over to me. I made reports to Mr. Keith when I got back. I always make reports to him. No, I did not get to the potato house on this occasion, but I had been there before. After I started up the street I ran about a block or so before the accident. Martin Ferguson and his boy were with me in the car at the time of the accident.

"From Dunlap the direct road is by way of Pikeville. You

turn to the right at the south edge of Pikeville to go to Dayton. I was driving a Ford sedan. There were six in the car. I stopped at Lee's Station and picked up Summers and Narramore. Summers said something about going to Pikeville and Narramore said he would like to go if he had any way to get back, and I told them that I would take them back, which I did. I knew Summers and Narramore and they worked at the peach shed in August when I worked there. Both men lived at Lee's Station. I picked them up about four o'clock in the afternoon. As far as I knew neither of them had any business in Pikeville. We went to the potato house for a few minutes. I took the boys back to Lee's Station but did not stay long. On the first trip up when Mrs. Graham and Ruby Simms got out I did not have to go up town to take them home as they lived right at the road from Dunlap to Dayton. I went back to Lee's Station just to take Narramore and Summers, did not have any business there. It was on my way back from Lee's Station that I had the accident."

The witness also testifies that he went to the potato house at Pikeville for the purpose of counting the hampers as he had been directed to do, and that he was accompanied by his two friends, and he did not then count the hampers for the reason above stated, and the only service he did for the master at this time was to stoke the fires in the potato house. He left the potato house to take his friends to Lee's Station and to then return to the potato house and complete his duties by counting the hampers. After counting these hampers it was his purpose to return to the home of his master at Dayton.

The plaintiff introduced the servant as his witness, and there is no conflict in the narrative, or any circumstance shown in the proof that discredits any part of it; the evidence being undisputed, the trial court thought it his duty to apply the law to the facts and to direct a verdict. He was of the opinion that the servant had stepped aside from his duties and had undertaken a mission of his own when he left the potato house in Pikeville to return his passengers to Lee's Station, and that the servant would not resume his duty and his employment until he had returned to the potato house in Pikeville to there count the hampers. The accident occurring upon the return; the servant was then engaged upon a mission of his own, and no liability against the master arose. This action of the trial court is assigned as the error.

It is insisted that reasonable minds might conclude that the servant had abandoned his duty when he agreed to take the passengers from Lee's Station to Pikeville and to return them, and when he performed this agreed service he no longer acted for himself but then resumed the performance of the duties for the master. It is conceded that other reasonable minds might take the

other view as the trial judge did, but it is insisted that two views being entertainable by reasonable minds, then it was a question for the jury to determine the view applicable. The plaintiff, in support of this insistence, cites the case of Bloodgood v. Whitney, 235 N. Y., 110, 139 N. E., 209, and the facts of the case are quite similar to the facts of the case here.

The defendant Whitney lived on Long Island, and he directed his chauffeur to take a passenger to a railroad station in New York City. Instead of returning after he had discharged the passenger, the chauffeur entered upon a series of excursions for his own ends with his companions. He drove with his companions to his employer's residence on Long Island, which he exhibited to his friends, and then returned them to the city, went to his employer's city garage and spent the night, and in the morning started to return to the defendant's home on Long Island, which he had left the afternoon before. The accident happened on his return trip.

The trial court held that when the servant or chauffeur returned to the home of the master, his duties were then performed, and he stepped aside when he returned his friends to the city and therefore was not in the service of the master at the time of the accident. (Such is the holding of the trial court in the present case.) The appellate court in discussing the case said:

"We think that at least a jury might say that when the chauffeur started from New York with his companions on the preceding afternoon it was in pursuance of a plan which was not completed until the return with them to the starting point; that the visit to defendant's country place for the purpose of showing it to his companions was a mere incident in the execution of this plan, just as a visit to any other object of interest would have been, and that it did not operate to terminate the original abandonment of his employer's services so that a new abandonment was commenced when the party started back to New York, and which was not ended until the car was returned the following morning.

"If this view should be adopted, then a jury would further be permitted to say that the chauffeur's tortious conduct and abandonment of his duty to his employer were completed when he returned to New York with his companions, and, that, when he started from the city garage the next morning, a sense of duty had once more resumed its place, and that, obediently to it, though tardily, he was serving his employer in returning the car to the place where it belonged, as he should have done the day before. While, of course, we do not consider the feature of entirety of purpose in passing upon the derelictions of a faithless chauffeur, as we would in some other connection, it is nevertheless necessary, in determining when his abandonment of duty commenced and ended, to consider the entire scope of his divergence from duty. When

we do this, it does seem, at least a jury might say, that it would be artificial under the circumstances to regard his incidental stop at his employer's place as constituting a termination of his original escapade and the commencement of a new one. And in this case it is the point of commencement of the abandonment which almost necessarily determines its completion."

Had the servant Elder had no duty to perform for his master other than to return the automobile to Dayton, and if he had taken these passengers from Lee's Station to Pikeville and returned them, and upon the way back to Pikeville the accident had occurred, then the facts of the two cases would have been more nearly similar; but the servant Elder had duties to perform for the master, which he did perform on his trip from Lee's Station to the potato house at Pikeville. He had to transport and return his helpers, co-servants of his, to their homes in Pikeville, and to go to the potato house to perform a duty for the master. If due to the servant's negligence an injury had happened to these helpers who were being transported to their homes, could it be said, with any show of reason, the servant was not then engaged in a duty for his master?

The servant's act in transporting these passengers from Lee's Station to Pikeville was not so much a stepping aside from the master's employment, as it was an act performed by the servant beyond and out of the scope of his employment. He was acting for himself and the master concurrently. This principle is illustrated by the case where the children were invited to take a ride in the empty wagon of the master upon its return trip. The servant was performing a duty for the master in returning the empty wagon for another load, but he had acted beyond the scope of his employment and without authority in inviting the children to ride with him, and the master was not responsible for a negative injury growing out of this unauthorized act of the servant. Stone Co. v. Pugh, 115 Tenn., 688, 91 S. W., 199, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881; and this case has been followed and the principle expanded in the cases of Hunt-Berlin Coal Co. v. Paton, 139 Tenn., 611, 202 S. W., 935; Kelly v. Louisiana Oil Refining Co., 167 Tenn., 101, 66 S. W. (2d), 997; Hoover Motor Express Co. v. Thomas, 16 Tenn. App., 664, 65 S. W. (2d), 621.

In the last-cited case it is said an act done by servants while engaged in a master's work, but not as a means or for purpose of performing such work, is not deemed the master's act.

It may be said that while the servant and driver was transporting his guests and fellow servants from Lee's Station to Pikeville, he was performing a service for himself and also a service for his master, and that the master is liable for the servant's negligent injury to his fellow servants accompanying him or to third par-

ties, but the master is not liable for a negligent injury to the driver's guests.

"Mixed Purpose. The owner may be liable where his vehicle is being used for his purposes and in the scope of the driver's employment notwithstanding it is also being used in part for the accommodation of the driver. But it has been held not sufficient to impose such liability that the driver as incidental to his main purpose is using the vehicle for his own convenience may have in mind some purpose of the owner." Motor Vehicles, 42 C. J., section 867, p. 1107.

"Intention as to Future Use. Where the accident happens while the vehicle is being used for the purposes of the owner, it is immaterial that the driver may have intended afterwards to use it for other purposes." Motor Vehicles, 42 C. J., p. 1108.

When the servant arrived at the potato house in Pikeville, stoked the fires, and deferred counting the baskets for a time, concluding to take his guests back to Lee's Station, he then stepped completely aside from his duties and abandoned every service of his employment until his return. The master did not authorize the transportation of these passengers from the potato house at Pikeville back to Lee's Station, and the transportation was of no service or benefit to the master, nor was it to be contemplated that the servant would engage in such a service. When the servant undertook this personal mission, he stepped aside completely from his employment, and abandoned it for the time being, and he did and could have only resumed his employment upon his return to the place where he was to perform his duties. Goodman v. Wilson, 129 Tenn., 464, 467, 166 S. W., 752, 51 L. R. A., (N. S.), 1116; Core v. Resha, 140 Tenn., 408, 412, 204 S. W., 1149; Woody v. Ball, 5 Tenn. App., 300; Phillips-Buttorff Manufacturing Co. v. McAlexander, Adm'r, 15 Tenn. App., 618.

There is authority that when the driver delivers his goods and starts to return to his employment that he then resumes his authority as the servant of the master; but the great weight of authority is contrary to this view, and the reason is expressed in the case of Curry v. Bickley, 196 Iowa, 827, 195 N. W., 617, 618, as follows:

"He is no more engaged in the employer's business, under such circumstances, in getting back to the place of employment, than he was in going away from it. He is serving his own purpose during all of such time. He lays aside his character of employee, and, without any right or authority so to do, takes his employer's car for purposes wholly personal to himself. He does not resume, in any legal or proper sense, the service of his master merely when he turns to get back to his place of employment."

It is insisted that the servant upon this character of trip

had the right to use the car in going to and returning from his meals; therefore when he arrived at Pikeville on his return and stopped in front of the restaurant and ordered a sandwich to be prepared and delivered to him upon his return, he at that point resumed his master's services. While in the employment of his master he might have the right to use the car in going to his meals and returning to his work, provided he could save his master's time and the use would be of some benefit to the master, but the servant having abandoned the employment and entered upon a service of his own, he has no right to use the car in an additional personal service in going for his meals.

"Going to or From Work or Meals. The use by the chauffeur of the owner's vehicle for the purpose of going to and from his place of employment is a use for the purpose of the chauffeur, and the owner is not liable for an injury occasioned while it is being so used, either without his knowledge or consent, or with his permission, as, for example, where he is going to or returning from a meal. The owner may, however, be liable where, under the circumstances, the chauffeur's use of the vehicle may be regarded as also for the owner's purposes, as where it enables the chauffeur to arrive earlier at his work, or shortens the time which he is required to have to procure his meals." Motor Vehicles, C. J., section 868, p. 1108.

Here, the servant had only to count the hampers and return to Dayton, and the master was not especially concerned how long a time the servant consumed with his meals.

There was no error in the act of the lower court in directing a verdict for the defendant; the judgment of the lower court is affirmed, with costs.

Ailor and McAmis, JJ., concur.