## HOOVER MOTOR EXPRESS CO., INC., v. THOMAS.

Middle Section.    April 1, 1933.

Petition for Certiorari denied by Supreme Court, December 15, 1933.

Richard Gleaves and W. C. Cherry, both of Nashville, for plaintiff in error.

C. G. Blackard, of Nashville, for defendant in error.

FAW, P. J. In this court this is a contest between Hoover Motor Express Company, Inc., and George M. Thomas, administrator of the estate of Mary Royer Cobb, deceased.

In the circuit court of Davidson county, the administrator sued Hoover Motor Express Company, Inc., Cordell Goad, and Ben F. Cassidy for $25,000 as damages, "both compensatory and punitive," for the alleged wrongful killing of his intestate, and obtained the verdict of a jury, and judgment of the court thereon, for $19,000 and costs against the three defendants; whereupon the Hoover Motor Express Company alone moved for a new trial, and (when its motion was overruled) appealed in error to this court.

The action was begun in the circuit court on October 27, 1931, and on November 3, 1931, the plaintiff filed a declaration containing five counts, which was, by leave of the court, amended after the verdict and judgment by the addition of a sixth count.

It is averred in the declaration, and appears without dispute, that, during the period of time covered by the transactions involved in this case, the defendant Hoover Motor Express Company, Inc., was a corporation, chartered and organized under and by virtue of the laws of the state of Tennessee, with a principal office and place of business in Nashville, Davidson county, Tennessee; that defendant Cordell Goad was a resident of the city of Nashville, Davidson county, Tennessee; and that defendant Ben F. Cassidy was a citizen of Murfreesboro, Rutherford county, Tennessee. However, it appears from the proof that defendant Cassidy had been for a time temporarily residing in the city of Memphis, Tennessee.

The undisputed proof also supports the averments of the declaration that on and prior to the 20th and 21st days of June, 1931, the defendant Hoover Motor Express Company, Inc. (hereinafter, for convenience, called the Hoover Company), was a common carrier, and was engaged in operating a motor vehicle line between Nashville, Tennessee, and Memphis, Tennessee, and intermediate points, transporting freight, merchandise, live stock, etc., for compensation, over the highways and between other points in Tennessee; but the truth of the further averment of the declaration made in the same connection,

that the defendant Hoover Company "was engaged, occasionally, in the transporting of passengers," is a matter of controversy on the record. Without referring at this time to the evidence with respect to the alleged practice of defendant Hoover Company to occasionally transport passengers, and/or the legal effect of such practice if proved, we may say here that it (the Hoover Company) was not authorized by its charter or by the Railroad and Public Utilities Commission, and hence was not authorized by law, to carry "passengers" on its motor vehicles.

Plaintiff avers in his declaration:

"That the defendants, Ben F. Cassidy and Cordell Goad, on and prior to June 21, 1931, were the regularly employed agents and drivers of the trucks belonging to the defendant corporation; that on said date hereinafter mentioned the defendants Goad and Cassidy, in the scope of their employment and acting under the direct orders of the officials of the defendant corporation, and in furtherance of their employers' business, made the regular trip from Memphis, Tennessee, to Nashville, Tennessee, leaving Memphis at five o'clock in the afternoon of June 20, 1931, and reaching Nashville about ten o'clock on the morning of June 21, 1931."

The averments just quoted are true with respect to defendant Goad, but with respect to defendant Cassidy they are unsupported by proof. Defendant Cassidy had formerly been employed by defendant Hoover Company as a truck driver for about three years, but the undisputed evidence shows that, on and some time prior to June 20, 1931, defendant Cassidy was driving a motor truck between Memphis, Tennessee, and Atlanta, Georgia, as an employee of the West Tennessee Motor Express Company, which maintained a joint terminal depot with the defendant Hoover Company in Memphis, but was otherwise a separate and independent corporation, and defendant Cassidy had no connection with the Hoover Company at the time plaintiff's intestate met her death. In the afternoon of June 20, 1931, Cassidy was "laid off," or suspended, for a week by his employer, the West Tennessee Motor Express Company, and defendant Goad, with the knowledge of James Simmons, the joint terminal agent of the two companies at Memphis, permitted Cassidy to ride on the Hoover Company's truck from Memphis to Nashville, as he (Cassidy) wished to go to Murfreesboro where his father's family lived.

The brief of the learned counsel for the administrator appears to have been framed on the theory that both Goad and Cassidy were employees of the Hoover Company, but it is stated in what seems to be a typewritten interlineation at the foot of page eight of the brief that: "Mr. Cassidy, who was not connected with the defendant Company, was riding the truck on the day in question with Mr. Simmons' permission."

The several counts of plaintiff's declaration differ in their respective averments touching the manner in which plaintiff's intestate gained access to the truck of defendant Hoover Company at the time here in question; there being averments that defendant Hoover Company gave plaintiff's intestate permission to be transported in one of its trucks from Memphis to Nashville and thus promised that it would safely carry her, etc., and also averments that defendants Goad and Cassidy gave plaintiff's intestate permission to make the trip in said truck and that this was known to the officers of defendant Hoover Company, who made no objection thereto.

Again, it is averred, in the fourth count of the declaration, that the drivers of the trucks of defendant Hoover Company were in the habit of "frequently transporting passengers" back and forth, between Memphis and Nashville, and that this fact was known to the officials of defendant Hoover Company, or could have been known to them "upon reasonable investigation such as is required of a prudent or reasonable official under similar circumstances."

In the fifth count, it is averred that plaintiff's intestate boarded said truck of defendant Hoover Company, and continued thereon as a passenger, with the knowledge, consent, and permission of defendants Goad and Cassidy, who, it is averred, had control of said truck and were driving and operating same on one of their regular runs from Memphis to Nashville within the apparent scope of their employment and in the furtherance of defendant Hoover Company's business.

Paragraph III of the first count of plaintiff's declaration is as follows:

"After traveling on said truck, as aforesaid, from Memphis, Tennessee, towards Nashville, Tennessee, and as the truck, under the control of defendants Goad and Cassidy, neared the Tennessee River and about one thousand yards west of the Toll House on the Tennessee River Bridge on State Highway No. 1, the said Goad and Cassidy, the agents and employees of the defendant corporation, and the drivers in charge of said truck, stopped said truck, and wilfully, wantonly, wrongfully, illegally, oppressively, recklessly and negligently, and in violation of the rights of plaintiff's intestate, inflicted wounds and bodily injuries upon her, from which she did then and there die, and after inflicting such injuries, as aforesaid, from which plaintiff's intestate did then and there die, the said defendants, Goad and Cassidy agents and employees of defendant corporation, and in whose care deceased's safe passage from Memphis, Tennessee, to Nashville, Tennessee, was intrusted by the defendant corporation, placed or had placed the mutilated body of deceased in said truck and carried it for forty miles east on said highway, where they then and there pulled and dragged her said body out of said truck and into the bushes in a wooded area, where

they threw it and left it to be fed upon by the vultures of the air and the vermin of the fields.

"Said injuries inflicted upon said deceased, from which she died as aforesaid, consisted of crushing in her skull and knocking out her brains with some blunt instrument, breaking her jaw with some blunt instrument and stabbing and cutting her body with some sharp instrument, and otherwise beating and bruising and mutilating her body."

The second, third, fourth, and fifth counts of the declaration expressly, by reference, adopt the above-quoted paragraph III of the first count.

The verdict of the jury was returned and the judgment of the court thereon was pronounced and entered on March 25, 1932, and thereafter, viz., on April 2, 1932, the court permitted the plaintiff to amend the above-quoted paragraph III of the first count of the declaration by inserting after the words "of said truck" in the eleventh line of said paragraph III, the following words:

"And while acting within the scope of their employment and in the furtherance of defendant corporation's business."

And by the same order the plaintiff was permitted to amend the same paragraph of the first count of the declaration by inserting after the word "negligently," in the thirteenth line of pargraph III, the following words: "In an effort to eject plaintiff's intestate from said truck and/or while ejecting her from said truck."

On the same day, viz., April 2, 1932, plaintiff also filed, pursuant to leave granted by the court, an additional (or sixth) count to his declaration, the third paragraph of which was substantially the same as the third paragraph of the first count as hereinbefore quoted, with the addition of the amendments allowed by the court after judgment as aforesaid.

The three defendants filed separate pleadings of not guilty to plaintiff's declaration, and, upon the issues thus made up, the case was tried to a jury, with the result before stated.

As a matter of convenience, we shall continue to refer to the parties as plaintiff and defendants according to their attitude on the record below.

On behalf of plaintiff administrator preliminary objection is made to the assignments of error of defendant Hoover Company, on the ground that it does not affirmatively appear in the assignments of error. or in the brief, that the errors assigned in this court were specifically stated in the motion for a new trial below and decided adversely to the plaintiff in error, defendant Hoover Company.

The question thus presented falls directly within the ruling in the case of L. & N. R. Co. v. Evins, 13 Tenn. App., 57, wherein it was held that, if the record discloses a motion for a new trial seasonably made and ruled adversely to the plaintiff in error, which motion

clearly challenges as erroneous the rulings of the trial court upon which the assignments of error on appeal are based, the specific assertion need not be made in the assignments that the trial court erred in overruling the motion for a new trial.

Defendant Hoover Company moved for peremptory instructions in its behalf at the close of the plaintiff's proof and again at the close of all the proof. Its first assignment of error is that the court erred in refusing to grant peremptory instructions at the close of plaintiff's proof. This assignment is overruled for the reason that defendant Hoover Company did not elect to stand upon its motion made and overruled at the close of plaintiff's evidence in chief, but proceeded thereafter to put on witnesses in its own behalf, and thereby waived its right to rely upon the motion theretofore made. Tenn. Cent. Ry. Co. v. Zearing, 2 Tenn. App., 451, 454; John Gerber Co. v. Smith, 150 Tenn., 255, 259, 263 S. W., 974; Lafollette Coal & Iron Co. v. Bennett, 8 Tenn. Civ. App., 210, 213; Nashville Railway & Light Co. v. Henderson, 118 Tenn., 284, 99 S. W., 700; Union Ins. Co. v. Smith, 124 U. S., 405, 8 S. Ct., 534, 31 L. Ed., 497; 26 R. C. L., p. 1083, section 87.

The second assignment of error is that the court erred in refusing to grant peremptory instructions on behalf of defendant Hoover Company at the close of all the proof; and the third assignment of error is that there is no evidence to support the verdict as to the Hoover Company.

The second and third assignments, supra, may be considered together, for if there was sufficient evidence to require the submission of the case to the jury for a finding upon the issues between the plaintiff and the defendant Hoover Company, there was some evidence to support the verdict against the Hoover Company.

These assignments have made it necessary for us to examine the entire record carefully, and to re-examine much of it repeatedly. The peculiar and unusual facts disclosed by the record led the learned trial judge to remark (at the close of all the proof) : "This is a very mysterious case. I don't know anybody short of a Sherlock Holmes that could unravel it in a satisfactory manner."

Plaintiff's intestate, Mary Royer Cobb, was twenty-two years of age at the time of her death. Two children—a girl five and a boy three years of age—survived her. According to the undisputed testimony of her father, L. Royer (a retired and pensioned "railway man," fifty-eight years of age), the deceased had spent her entire life at Decatur, Alabama, until about the first of June, 1931—three weeks prior to her death. It appears from the testimony of four other witnesses residing at Decatur, Alabama, viz.: B. L. Malone, probate judge; Ben McDermitt, a railway engineer; Otto Mones, an insurance and real estate broker; and Frank Brown, an undertaker—that up to the time she left Decatur about June 1, 1931,

Mary Royer Cobb bore an excellent reputation for virtue and chastity, sobriety, and general good moral character, and that her surroundings, environment, and associations at Decatur were good. The four witnesses just named had known deceased from her early childhood,

The record is silent concerning the husband of plaintiff's intestate and, aside from some meager suggestions that she was "looking for work," the record does not disclose any occasion or reason for the deceased to leave her children and her kindred at Decatur.

The plaintiff's witness D. L. Stickley testified that he is a "picture machine operator;" that he is thirty years of age; that he has been living in Birmingham, Alabama, for the past three years; that prior to that time he had lived at Decatur, Alabama, and he had known Mary Royer Cobb and the Royer family for six or seven years.

Stickley testified further that he came to Nashville "looking for work" the last of May, 1931, and on Sunday (May 31st) about ten o'clock A. M., he met Mary Royer Cobb unexpectedly in Nashville, "at the restaurant across the street from the Bus Station," and had breakfast with her, and they remained together until about five o'clock that afternoon when they ate at the same restaurant above mentioned and then separated, witness going to the Merchants' Hotel on Broadway and Mary Royer Cobb going to her room "over on Seventh Avenue somewhere;" that witness did not see Mary Royer Cobb again until next morning (Monday, June 1st), when he met her, by appointment, at the same restaurant as before, where they had breakfast about nine o'clock, and later went to Loew's Theatre; that about one o'clock that afternoon they went to a truck station to try to get a ride to Memphis, but found that the trucks from that station went to Chattanooga; that they were there directed to "Mr. Hoover's place" as one that "had trucks that went to Memphis," and they went to Mr. Hoover's place and "asked the driver," who told them that they would have to see Mr. Hoover; and that they saw Mr. Hoover about 1:30 P. M.

We quote Stickley's testimony as to what transpired after witness and Mary Royer Cobb found Mr. Hoover, as follows:

"Q. What did you say to Mr. Hoover? A. We asked him about getting a ride to Memphis, we were looking for work, didn't have any money.

"Q. What did he say? A. He said he just couldn't let us go.

"Q. What did you all do? A. He called us back and told us he would let us go but not on the same truck, and we would have to ride on separate trucks, he didn't know whether he would send two trucks that day, told us to come back about five-thirty and he would know.

"Q. Did you go back at five-thirty? A. Yes, sir.

"Q. Five or five-thirty, whichever it was? A. Yes, sir.

"Q. Did you see Mr. Hoover? A. Yes, sir.

"Q. What did he say? A. He told us he was going to send both trucks, we both could go all right.

"Q. When he told you that, what did you do? A. He told us there was a truck ready to go then, and he told us one could go on that and the other would come in about five minutes, and he told Mary that she could ride that truck and she went on.

"Q. Did Mr. Hoover come over with you? A. Yes, sir.

"Q. Did you go? A. Yes, sir.

"Q. Did he see her get in the truck? A. Yes, sir.

"Q. Did she have any baggage? A. She had a grip, yes sir.

"Q. What was done with her grip? A. The driver put it in the truck.

"Q. The driver put it in the truck? A. Yes, sir.

"The Court: That was here in Nashville? A. Yes, sir.

"The Court: You were heading out for Memphis? A. Yes, sir.

"Mr. Blackard: Q. Whereabouts was that? A. That was at the station.

"Q. At the Hoover freight station here in Nashville? A. Yes, sir.

"Q. At that time down on Lea Street, I believe? A. Yes, sir.

"Q. After she got in the truck and you and the boy and the driver, put her baggage in the truck, where did you put it in the truck? A. Put it in the back there.

"Q. In the back? A. Yes, sir.

"Q. Then what did you do? A. Me and Mr. Hoover stood there and talked a few minutes at the back of the truck.

"Q. What did Mr. Hoover say to you? A. He asked me was me and the young lady married, I told him we were and he asked me how long we had been married and I told him about seven or eight years, and he stood there, and he walked up where Mary was at and asked her something like he had asked me, and he came back and told me, said the young lady told me she had been married only five or six months, and I laughed and said, Mr. Hoover, we are not married at all, we are trying to find work, and he said, I hope you find work.

"Q. What did you do? A. There was a car came up, an insurance man, and asked me, would I mind walking up the street and catching my truck.

"Mr. Cherry: I didn't catch that. A. There was a car came up and Mr. Hoover asked me to walk up the street and catch the truck, said he didn't want the insurance man to see me get on the truck.

"Mr. Blackard: Q. Had the truck that Mary Royer Cobb was in, had it already gone? A. Yes, sir, it had already gone.

"Q. Then it had gone before this other car drove up and Mr. Hoover told you there is an insurance man and for you to walk up the street and catch the truck? A. Yes, sir.

"Q. Then what did you do? A. I walked up the street and stood about five or ten minutes before the truck came.

"Q. How far up the street did you walk? A. I don't know, sir, not far.

"Q. About how far? A. Well, I guess about seventy-five feet, maybe.

"Q. About seventy-five feet? A. Yes, sir.

"Q. You couldn't see the station from where you were? A. Yes, sir.

"Q. Did a truck pull up there then? A. Yes, sir, in a few minutes.

"Q. What happened? A. He stopped and the driver motioned for me to come on and get in. So I went over and got in and went on."

Stickley testified, on cross-examination, that he saw Mary Royer Cobb shortly after their arrival in Memphis on the following morning, and she told him at that time that she was going back to Brownsville, Tennessee, that night with the same driver she went down with; that she said the chief of police at Brownsville told her he thought he could get her a job at a hospital.

Stickley also testified that he had not seen Mary Royer Cobb since the morning of their arrival at Memphis as above stated.

There is undisputed proof that R. D. (Dick) Woods, the driver of the truck on which Mary Royer Cobb rode to Memphis on the night of June 1, 1931, introduced her to defendant Cassidy on the day of her arrival at Memphis; that she procured a room in Memphis, and she and defendant Cassidy (an unmarried man in his early twenties) "lived together" there for about two weeks.

Between the time of her arrival in Memphis on the morning of June 2nd and her death on June 21st, plaintiff's intestate made several night trips with the drivers on the Hoover Company's trucks from Memphis to the point of meeting with a Hoover truck en route to Memphis from Nashville, on which latter truck she would return to Memphis. About five o'clock in the afternoon of Friday, June 19th, plaintiff's witness R. A. Flippen, driving a Hoover truck, "picked up" Mary Royer Cobb about a half block from the Hoover Company's terminal in Memphis. Flippen testified that he was not expecting to see her at the time he picked her up, but that she stopped him and asked him to let her ride to Nashville to get her suitcase. However, she apparently misrepresented her purpose or changed her mind about going to Nashville, for she left Flippen's truck at Dickson about five o'clock Saturday morning, June 20th, and returned to Memphis on another Hoover truck driven by defendant Cordell Goad, reaching Memphis (and alighting from the truck several blocks from the terminal station) between three and four o'clock in the afternoon.

About 6:30 or seven o'clock in the evening of the same day (Saturday, June 20th), a truck of the Hoover Company left the company's terminal in Memphis bound for Nashville with defendant Goad driving. Defendant Cassidy was riding with Goad on said truck by permission of Mr. Simmons, the Memphis manager of defendant Hoover Company, under circumstances which have already been stated.

Mary Royer Cobb boarded said truck after it left the terminal and without the knowledge of Mr. Simmons, the manager of the Hoover Company at Memphis. According to the testimony of Goad and Cassidy, she had an understanding with Cassidy that she would return to Nashville with Cassidy and from Nashville would return to her home at Decatur. Goad testified that he had no previous understanding with her for this trip, and did not know that she wanted to ride the truck at that time until he saw her waiting about a block and a half from the terminal and Cassidy told him that he was expecting her to go.

At a filling station in the suburbs of Memphis, Cassidy procured a half pint of whisky, and he and Goad and a male friend at the station drank all of it.

At or near Mason—thirty or forty miles out of Memphis—Cassidy procured a pint bottle of whisky, out of which Goad "took a swallow" and Cassidy and Mary drank the remainder. They reached Jackson about eleven P. M., and remained there until shortly after one A. M., While there the truck was loaded with lumber by two negroes employed by Goad for that purpose, and in the meantime Cassidy and Mary procured and drank some more whisky—just how much does not appear.

The two negroes who loaded the lumber at Jackson—Jesse Brown and Frank Simmons—requested and obtained permission from Goad to ride to Nashville on the truck, which was a three and one-half ton International truck, with a "Van trailer" twenty-six or twenty-nine feet long and eight feet wide and with doors on the rear end of the trailer.

It appears from evidence which will be presently stated that Mary Royer Cobb was killed on State Highway No. 1, about seven miles east of the town of Camden in this state and about six hundred yards west of the Toll House on the bridge over the Tennessee River at Trotter's landing.

. The truck reached Camden shortly after daylight on Sunday morning. During the journey from Jackson to Camden the five occupants of the truck shifted their positions from time to time. Part of the time the two negroes rode in the trailer and the woman and two white men on the driver's seat in the cab, and then the woman rode in the trailer, sometimes with Goad and sometimes with Cassidy,

while the two negroes rode in front with one or the other of the white men.

Plaintiff's witness Garland Hatley, the operator of a filling station at Camden, testified that a Hoover truck with Goad, Cassidy, two negroes, and a woman aboard stopped at his filling station about daylight on Sunday morning, June 21st; that the occupants of the truck bought some oil and coca-cola, and all seemed to be in "a good humor;" that the woman asked witness for some "liquor;" that she did not get any liquor from witness or at his place, but he smelled whisky on her breath and she appeared to be "drinking;" that he had seen the same woman on the Hoover trucks five or six times; that he had seen her on a Hoover truck driven by Goad and going toward Memphis the day before (Saturday, June 20th). Hatley saw the body of plaintiff's intestate after her death and identified the body as that of the same woman who stopped at his filling station with Goad and Cassidy and the two negroes on Sunday morning as related above.

Hatley also testified that when said truck left his station at Camden, headed towards Nashville, the woman was riding on the seat in the cab between Goad and Cassidy, and the two negroes were in the trailer.

Plaintiff's witnesses J. S. Bevins and Earl Bomar saw the truck as it passed Bevins's filling station, going east, about two miles west of the bridge at Trotter's Landing, and the woman was then riding between two white men on the seat in the cab.

The testimony of the last-mentioned three witnesses with respect to the position of "the woman" between the two men is mentioned for the reason that it is inconsistent with the testimony of defendants Goad and Cassidy relating to the manner in which Mary Royer Cobb lost her life.

Plaintiff's witness Herman Rushing, toll collector on the Trotter's Landing Bridge, was on duty in the toll house from four o'clock A. M., to eight A. M., on Sunday, June 21, 1931, and on the witness stand he was asked and answered as follows:

"Q. Did anything unusual happen on this day? A. Yes, sir.

"Q. State just what happened? A. A Hoover truck that operates between Memphis and Nashville drew up and stopped within several hundred feet of the bridge. That wasn't so unusual as trucks draw up there lots of times and park and the drivers take a nap.

"Q. What happened then? A. I saw three people get out and go to the rear of the truck.

"Q. On which side did they get out on? A. One got out on the driver's side and two on the other side.

"Q. Where did they go when they got out of the truck? A. They disappeared behind the truck.

"Q. Then what happened? A. Then I heard screaming.

"Q. How long after they went to the back of the truck before you heard the screaming? A. About five or eight or maybe ten minutes.

"Q. Was the truck standing still when you heard the screams? A. Yes, sir.

"Q. Now just go ahead and tell us what you heard and what you did? A. The screams aroused my attention so I went out of the Toll House. Just about the time that I got out of the Toll House the screaming ceased. I went back in the Toll House and I picked up a book and started reading. Then the truck came on up to the bridge.

"Q. Was there anyone in the truck? A. Yes, sir. A driver and three other passengers.

"Q. Were they all white? A. I don't know. I don't think so.

"Q. Did the driver pay the toll? A. Yes, sir. He paid for three besides the driver.

"Q. Did you notice anything different? I mean about the driver? A. He acted as if he was in a big hurry. The drivers usually stop and pass a few words.

"Q. Then what did you do? A. As he pulled away from the Toll House I took the number of the trailer.

"Q. What was the number of the trailer? A. No.—3055.

"Q. What kind of a trailer was this? A. It was a Van trailer and was attached to the truck.

"Q. Was this trailer attached to a Hoover truck? A. Yes, sir.

"Q. How long was it between the time the truck stopped and started again? A. It was about twenty minutes.

"Q. Did you give this number to anyone? A. Yes, sir. The next day I gave the number to Policeman Pafford.

"Q. Did you go down there after the truck left? A. I went down there Tuesday morning.

"Q. About how far from the Toll House did the truck stop? A. About 1800 feet.

"Q. Did you see anything? A. I saw blood and hair and brains on the highway.

"Q. Was this the same place you saw the truck stop? A. Yes, sir.

"Q. Could you see these three people behind the truck? A. I could see their feet."

On the morning of Sunday, June 21, 1931, plaintiff's witness B. L. Woodson was driving in an automobile, with his wife and a friend, from Paris, where he was employed by the Louisville & Nashville Railroad Company, to his home near the city of Jackson, and crossed the bridge at Trotter's Landing about 5:15 o'clock A. M. We quote from his testimony as follows:

"Q. Did you see a truck about one-half mile from the bridge?

A. Yes, sir, I saw a truck about one-half mile this side of the bridge standing still, headed for Nashville.

"Q. Are you sure it was stopped? A. Yes, sir.

"Q. How far away were you? A. I saw it when I left the bridge.

"Q. Did you stop? A. No, sir, I did not stop.

"Q. Did you see anybody by the truck? A. Yes, sir, I saw one in front of the truck, a young man.

"Q. Did you see any more men? A. Yes, sir, I saw a man behind the truck. He was close to the rear end of the truck.

"Q. Were those men white or black? A. They were white men.

"Q. What else did you see? I saw a woman's body about twenty or thirty feet behind the truck on my left.

"Q. What position was she in? A. She was face down, stretched out across the road.

"Q. Did you stop? A. No, sir.

"Q. Did you see any injuries on the woman? A. No, sir.

"Q. Did you see any other people? A. No, sir.

"Q. And she was twenty or thirty feet away? A. Yes, sir.

"Q. Did you see any colored people there? A. No, sir.

"Cross-Questioning:

"Q. You say that when you passed you saw one white man in front of the truck and one in the back of the truck and the woman's body was twenty or thirty feet behind the truck? It was lying across the road with the face down nearer the right side of the road with the head near the outside and the feet near the middle of the road? A. Yes, sir, and her head was about two feet from the outside edge of the pavement.

"Q. What was the condition of her clothes? A. They were ruffled or rolled up around her waist.

"Q. Did she have on any hose? A. No, sir.

"Q. Did she have on any slippers? A. Yes, sir, she had on black slippers.

"Q. How fast were you driving? A. I was driving about twenty-five or thirty miles an hour.

"Q. How long did it take you to drive to where the body was from the toll bridge? A. About two or three minutes. I hadn't started good.

"Q. Were these men standing still? A. Yes, sir.

"Q. Did they attempt to stop you or holler or anything? A. No, sir."

The two negroes who loaded the truck in question at Jackson—Jesse Brown and Frank Simmons—testified as witnesses for plaintiff. Jesse Brown stated that he was twenty-three years of age, married, and lived in Jackson, and that he and Frank Simmons loaded the truck with "creosoted lumber" at Jackson.

We quote from Jesse Brown's testimony as follows:

"Q. Did you make arrangements to come to Nashville on this truck? A. No, sir, I didn't make no arrangements. Frank asked me to go to Nashville and I said that I would like to go if I could get back in time to go to work Monday morning. Mr. Goad said that he would see that we got back in time to go to work.

"Q. What did you do then? A. Well, when we got the truck loaded we started for Nashville.

"Q. Did they fix a place for you and Frank to ride? A. Yes, sir. He took a spare tire off of the left end and let the tail gate down and left one door open.

"Q. Where did you and Frank ride? A. We rode on the outside on the tail gate.

"Q. Was there anything said or done about this woman going with them? A. Yes, sir. The lady was standing on the platform and when we got ready to start she said she wasn't going anywhere with them son of bitches and one of the men said 'Hell, yes you are.' So, one of them got hold of her on one side and one on the other and made her get off of the platform and put her in the cab.

"Q. Now, where were you and Frank sitting? A. We were sitting on the tail gate.

"Q. What time did you leave Jackson? A. About 1:30 A. M.

"Q. How far did you ride before the truck stopped? A. To Spring Creek, about fourteen miles I guess.

"Q. What were you and Frank doing then? A. We crawled up on top of the truck. All at once the truck stopped and he asked us if we could drive. Mr. Goad said that he was sleepy and that he wanted us to drive.

"Q. Which one of you drove then? A. Frank wanted to drive first, so he drove.

"Q. How were you all sitting then? A. The three white people moved over and made room for Frank in the cab and I rode on the fender.

"Q. What did you do then? A. I went to sleep on the fender and when I woke up Frank was asking me to drive.

"Q. Was all of the people still in the cab? A. Yes, sir, and Mr. Cassidy was asleep.

"Q. How far did you drive then? A. I drove to Sawyer's Mill.

"Q. What were the people in the cab doing then? A. Mr. Goad and the lady went to the back of the truck.

"Q. Who was riding in the cab then? A. Mr. Cassidy, Frank and myself were riding in the cab then.

"Q. How far did you drive? A. I drove to Sawyer's Mill and Mr. Goad said for me to stop at the next Pan-Am Filling Station. So I drove on until I came to a Pan-Am Filling Station and I stopped. Mr. Goad said that this was a Pan-Am Station but that this wasn't the one where he wanted to stop. So we stayed awhile and left.

"Q. Who was driving when you left? A. Mr. Goad was driving.

"Q. Where was the lady? A. She was in the cab.

"Q. Where were you and Frank? A. We were on the back of the truck.

"Q. When did you make your next stop? A. We stopped at the Pan-Am Filling Station in Camden.

"Q. What did you buy there? A. We bought an Orange Crush and a quart of cylinder oil.

"Q. Then, what did you do? A. Then we left Camden and they told us to stay hid so that we wouldn't have to pay any toll fare. I told Mr. Goad to let us know when we got to the bridge and he said 'Hell—get in there.' So Frank and myself went in and stayed in there until the truck stopped.

"Q. Did you and Frank hear anything? A. Yes, sir. We heard the truck stop and we heard a lady holler and I heard three licks and the truck pulled off and stopped again. 'Jim, Jim—get out and help me.' I got out and saw the lady dead on the highway and I asked Mr. Goad what was the matter. He said that the lady fell out of the truck and he said 'Help me get her up.' I didn't want to have anything to do with it and I told him so and so then I saw him run his hand in his pocket, so I helped him.

"Q. Who put the lady in the truck? A. Mr. Goad, Frank and myself put her in the truck.

"Q. What side of the highway was she on? A. On the right side.

"Q. What did you all do then? A. I didn't want to ride on any further and I told Mr. Goad so, and I told him that I didn't want to have anything to do with this and he made me.

"Q. Was there any blood on the wheels? A. No, sir.

"Q. Did you see any blood anywhere? A. A crank was lying there beside one of the wheels.

"Q. What was the crank made of? A. It was made out of iron.

"Q. Did you see anything on it? A. I saw blood and brains on it.

"Q. Who picked up the crank? A. Mr. Goad picked it up.

"Q. What did he do with it? A. He put it in the cab.

"Q. How were you sitting when you left? A. Mr. Cassidy was driving, Mr. Goad was in the middle and Frank was sitting on the outside and I was riding on the fender.

"Q. Did you hear anything that Mr. Cassidy and Mr. Goad said? A. Yes, sir. Mr. Cassidy said that he was going to kill himself before the day was gone. Mr. Goad said, 'Aw, there is no use in doing anything like that. No one will ever know about this.' Mr. Cassidy said, 'Is there any blood on my suitcase,' and Mr. Goad said, 'No.'

"Q. Then what did you do? A. We went across the bridge.

"Q. Did you pay the toll? A. Mr. Goad did.

"Q. Did you all have any conversation then? A. Yes, sir. I asked Mr. Goad why he didn't call an ambulance and he said, 'Keep your dam mouth shut.' Mr. Cassidy said, 'Look behind us and see if you see a car coming.' I did and I saw a brown car coming. Mr. Cassidy took the purse then and took six cents out of it and threw it overboard.

"Q. Where were you riding then? A. I was riding on the fender.

"Q. How long did you ride on the fender? A. I rode on the fender until we took the lady out.

"Q. Where did you take the lady out? A. Close to McEwen.

"Q. Was anything said during this time? A. I don't know.

"Q. What was said when you got to the place where you put her out? A. Mr. Goad said, 'This is a good place to put her out.' I told Mr. Goad again that I didn't want to have anything to do with this but he made us.

"Q. Just what did you do, Jesse? Just go ahead and tell us just what you did. A. Mr. Goad grabbed her by one leg and pulled her out of the truck. He let her fall from the truck to the asphalt and he said, 'There she was,' to take her out in the woods.' So Frank and myself grabbed her by one arm and leg and carried her out in the woods. We left her on the left hand side of the highway. Something caught her out there and pulled her out of my hands and so I never stopped—I just kept going.

"Q. What were they doing when you all came back? A. Mr. Goad was trying to get the blood and brains out of the truck.

"Q. Where was Mr. Cassidy? A. He was under the steering wheel.

"Q. What did they say to you and Frank when you came back? A. Mr. Goad asked us if we covered her up and we said 'No,' so he made Frank go back down there and cover her up.

"Q. Did Mr. Goad have any blood on him? A. Yes, sir. He had blood on his shirt and there was blood on that piece of iron lying beside the wheel of the truck.

"Q. Where did Mr. Goad put the crank? A. He put it in the cab of the truck.

"Q. . . . A. Mr. Goad told me to clean up the crank, so I did. Mr. Goad told me to get a rag and put some gas and try to get the blood off of his shirt.

"Q. Did they wash the truck out? A. Yes, sir, they washed it out.

"Q. Where did they wash the truck out? A. They stopped and washed it out close to White Bluff.

"Q. Did you all stop at White Bluff? A. Yes, sir.

"Q. What did you do at White Bluff? A. They stopped and got water and washed their hands and washed the truck out.

"Q. How did they wash the truck out? A. They washed it out with a rag and gasoline and sand.

"Q. How long did you stay at White Bluff? A. About ten minutes.

"Q. Was anything said at White Bluff? A. When Mr. Goad got through washing out the truck, Mr. Cassidy said 'Is it all right,' and Mr. Goad said 'Yes—you couldn't tell it.'

"Q. Then what did you do? A. We started on to Nashville.

"Q. Did you go all the way to Nashville? A. We went to the suburbs of Nashville.

"Q. What did you do then? A. We saw another Hoover truck coming and so Mr. Goad asked them to take us back to Jackson but the driver said that he had to go by some place before he would go to Jackson to pick up some freight, but he said that he would take us, so we got in.

"Q. Did Mr. Goad and Cassidy say anything to you? A. Mr. Goad said, 'Keep your mouth shut now.'

"Q. Did you hear Mr. Cassidy say anything about killing himself more than once? A. No, sir. . . .

"Q. How far was it from the bridge when the truck slowed down? A. It was a pretty good way.

"Q. Did you hear the doors shut when the truck stopped? A. I heard both of the doors shut.

"Q. How long before you heard the screams? A. Right about then.

"Q. How long before you heard the licks? A. Just as she screamed all along together.

"Q. How long did she scream? A. Not long.

"Q. How long was it then before they called you? A. The truck moved on and then stopped again and then they call us. I guess three—five or six minutes.

"Q. Did you hear them saying anything? A. No, sir.

"Q. What was the position of the lady when you first saw her? A. She was lying face down on the highway.

"Q. How were her clothes? A. They were down.

"Q. Did you hear a car pass? A. No, sir.

"Q. Was she dead? A. Yes, sir. . . .

"Q. Did the truck stop right quick when it stopped? A. No, sir. It just kinda slowed down.

"Q. How were all of you sitting when the truck stopped? A. We were squatting down in the truck.

"Q. Did it throw you over when the truck stopped? A. No, sir. It just jerked us a little.

"Q. Then what did you hear? A. I heard the doors shut and then I heard screams.

"Q. On which side did the screams seem to come from? A. From the right side of the truck.

"Q. Did it seem to you like the screams came from the back of the truck? A. I don't know."

The testimony of Frank Simmons, the other one of the two negroes who loaded the truck at Jackson, is, with some immaterial variations in minor details, the same in substance as that of Jesse Brown.

The plaintiff's witness S. D. Love lives about seven miles east of the town of McEwen and near State Highway No. 1 (which is United States Highway No. 70). Early in the morning of Monday, June 22, 1931, this witness, while walking along the highway at a point about two miles west of his home and five miles east of McEwen, observed "a streak of blood" across the highway "about as wide as a man's body," and he followed "the blood" into some "thick woods" on the north side of the highway and found the dead body of a woman about thirty steps from the highway. Mr. Lowe promptly reported the facts just stated to an undertaker and a magistrate at McEwen, and returned with them and others to the place where he had found the woman's body, which was later identified as the body of Mary Royer Cobb.

The condition of the body was described by an undertaker and two physicians introduced as witnesses for plaintiff. We quote from the testimony of Dr. J. A. Suggs, one of the two physicians mentioned above, as follows:

"Q. What time did you go? What day did you go and what time? A. I went out there on Monday, the 22nd day of June, 1931, about eight o'clock.

"Q. Where did you find the body? A. We found the body on the north side of the road in the bushes about twenty steps from the highway.

"Q. Did you see anything on the highway? A. Yes—I saw a streak of blood on the highway.

"Q. Did this streak of blood lead off to where the body was? A. Yes, sir.

"Q. Did you make examination of the body there in the woods? A. Yes, sir.

"Q. Now, will you just explain in detail the examination you made and just what you found? A. The body was found in the bushes lying on the back and it was the body of a woman. The top of her head was broken off. She had a scar on one check and the lower jaw was broken. She also had holes in her abdomen just below the navel and a gash on her left thigh. The left leg was broken just above the ankle. The foot was darkened some. It could have been mashed.

"Q. Describe the part of the head injured in detail? A. It was the top of the head and it was broken off just above the eye brows. Pretty well all the top of her head.

"Q. Was all of her head gone off the top? A. There was a big cavity in the top of her head.

"Q. Was all the top of her head gone? A. No—Some pieces of bone and flesh was standing around the edges and some was down in the cavity.

"Q. How far above the eye brow was the head taken off? A. About one inch. It went pretty well round the top, a little more to the left, and extended around the head one inch above the eye brow.

"Q. What was the condition of her face? A. The eyes were not mashed, the nose seemed to be straight and the mouth was all right.

"Q. Were the cheek bones standing up? A. Yes, sir.

"Q. How were the ears? A. The ears were intact.

"Q. Was any of her face mashed? A. No.

"Q. How far above the ears was the skull crushed? A. On the left side one inch above the ear and on the right side a little higher up.

"Q. What was the condition of the brains? A. I couldn't tell much about them. Some of them was on the road.

"Q. How much surface was injured on top of the head? A. Pretty well all of it. Some particles had fallen down in the wound and the edges were very irregular.

"Q. You say some of the skull was on the inside of the wound? A. Yes, sir.

"Q. Now, just describe the head and show us just where the injured part was? A. Well, the head was crushed about one inch above the eye—left eye—and it went on around the forehead above the right eye just a little higher and on around the right ear about one and one-half inches above the right ear and then it went on around the back of the head and was about three inches above the neck on the back of the head.

"Q. Was the top of the head gone or what? A. Part of it was gone and part of it was knocked down in the cavity.

"Q. Was the cavity intact? A. Yes, sir.

"Q. The face wasn't mashed in? A. No.

"Q. What about the wounds in the abdomen? A. There were two holes in the abdomen.

"Q. Did you probe these holes? A. Yes, sir, I probed both holes and they both went all the way through to the abdominal cavity.

"Q. What size were these holes? A. One was the size of a man's little finger and the other was larger. I guess that you could put three good size fingers in the larger hole.

"Q. Describe the wound on the thigh? A. The wound on the thigh was inside of the left thigh about three inches from the groin.

"Q. What was the nature of the wound on the thigh? A. It was a smooth cut.

"Q. Was the wound on the head inflicted with a sharp or blunt instrument? A. I would say a blunt instrument.

"Q. Were the wounds in the abdomen inflicted with a sharp or blunt instrument? A. Decomposition had set in so that I couldn't tell whether it was done with a sharp or blunt instrument.

"Q. Was the wound on the thigh inflicted with a sharp or blunt instrument? A. It was inflicted with a sharp instrument. It looked like it had been done with a knife.

"Q. When you examined this woman were there any other physicians present? A. No, sir.

"Q. How long had she been dead? A. About twenty-four hours.

"Q. When you saw her did she have on any clothing? A. Yes, sir.

"Q. What kind? A. She had on a dress and bloomers.

"Q. Were her clothes up or down? A. Her clothes were pulled up under her arms on the back of her neck.

"Q. What were the condition of her bloomers? A. They were up.

"Q. Did the bloomers cover the wounds on the abdomen and thigh? A. They covered the wounds on the abdomen and nearly all of the wound on the thigh.

"Q. Did the wound on the thigh extend below the bloomers? A. Yes, sir.

"Q. How were the bloomers fastened around the waist? A. They were fastened with elastic.

"Q. Did you examine the bloomers? A. Yes, sir.

"Q. Did you find any holes in them? A. No, sir.

"Q. Did you examine them for that purpose? A. Yes, sir.

"Cross-Examination:

"Q. Were these bloomers or step-ins? A. They were bloomers.

"Q. And there were no holes in the bloomers? A. No, sir.

"Q. You say the wound on the head was more shallow on the right side than on the left side? A. A fraction so.

"Q. So the wound bore down toward the left side? A. Yes, sir.

"Q. And the left leg was broken? A. Yes, sir.

"Q. And the left foot was blue? A. Yes, sir.

"Q. And the left chin had a gash on it? A. Yes, sir."

Plaintiff's witness Ted Vaughn (an "investigator" for the Attorney General's office at Nashville) testified that, pursuant to a telephone message from the sheriff of Humphreys county giving him the number of a truck, he went to the Hoover Truck Depot in Nashville on Monday night (June 22nd) about 8:30 o'clock, and there examined a truck which we understand was the same truck on which defendants Goad and Cassidy made the trip from Memphis to Nashville now under investigation. Mr. Vaughn's testimony concerning his examination of the truck is as follows:

"Q. What did you do when you got down there? A. Made an examination ·of the truck which the number that I had of this truck and I examined that and found some blood and brain matter, and some hair on the tail gate, and in the crevices of this truck.

"Q. What kind of truck was it? A. I don't recall the make of the truck, it was a truck with a trailer to it, that is a truck and trailer they call it, a pretty good sized truck, closed in, had doors on the back, close the doors up and the tail gate came up and fastened the doors with a chain around it, and the back of this tail gate was where I found most of the blood and some brain matter and then on the edge just on the inside of thè floor on the right hand corner and on that part was where I found the hair and some more blood."

Defendant Cordell Goad, twenty-eight years of age, with a wife and two children living in Nashville, testified that he had worked for the Hoover Company for about six months prior and until June, 1931; that he first saw Mary Royer Cobb about the first of June, 1931, at the Hoover Company's Depot in Nashville; that he saw her the next day on Front street in Memphis and saw her riding "up and down the road" with some of the other drivers between that time and June 20th; that on June 20th she rode with him from Dickson to Memphis, and went back on the truck with him and Cassidy that night to a point near the bridge at Trotter's Landing where she lost her life on Sunday morning. He denied that Mary Royer Cobb objected to getting on the truck with him and Cassidy at Jackson, as Jesse Brown and Frank Simmons had testified.

Taking up Goad's account of the journey from Memphis at the point where the truck left Camden, we quote from his testimony as follows:

"Q. What position did that place you all in after Ben said 'Scoot over and I will drive some?' A. That put her on the right hand side of the truck, me in the middle, and him on the left hand side under the steering wheel.

"Q. That is, on the seat in the cab of the truck? A. Yes, sir.

"Q. What happened with reference to driving out? A. We started on off and come toward the river.

"Q. About what time was that, Cordell? A. About five-thirty or six o'clock in the morning, I couldn't say exactly.

"Q. Were all of you engaged in conversation? A. Yes, sir, we were laughing and talking there when we left.

"Q. Don't answer this question until the Court rules on it. You can answer this yes or no without saying what it was. Did you hear a conversation between Ben and Mrs. Cobb? A. Yes, sir.

"Q. Now don't answer until the Court rules on this. I want to ask you to tell the Court and jury what that conversation was, now wait, don't answer that until he rules on it?

"Mr. Blackard: I don't know what he is going to state, some things would be competent and some would not.

"Mr. Embry: Charlie, I could tell you what he is going to say.

"Mr. Blackard: I have no objection to this.

"Mr. Embry: Q. Go ahead and state what the conversation was you heard just before you got to the bridge, between Camden and the place where the tragedy occurred? Now Cordell, do you understand what I am asking you for now? A. Yes, sir.

"Q. Just go ahead in your own words, and tell the Court and jury what happened?

"Mr. Blackard: May it please the Court, I want to note this on the record, I want to object to that question.

"The Court: Overruled.

"To which action of the Court the plaintiff then and there duly excepted.

"Mr. Embry: Q. Just go ahead, Mr. Goad? A. She was wanting to go home with him, and he told her he couldn't take her home with him, it was a small town and all his people, his father, mother and sister—

"The Court: What town was that? A. Murfreesboro.

"Mr. Embry: Q. You mean Mrs. Cobb wanted to go home with Ben Cassidy? A. Yes, sir.

"Q. Where is his home? A. Murfreesboro.

"Q. Just what did she say? A. She just wanted to go home with him, and he told her she couldn't.

"Mr. Blackard: That is calling for transactions with the deceased, I am not making an argument, I just want to get it in the record.

"The Court: Overruled.

"To which action of the Court the plaintiff then and there duly excepted.

"Mr. Embry: Q. Go ahead and tell what she said? A. She wanted to go home, Miss Mary wanted to go home with him, and he told her, I couldn't take you up there, that his father and mother was there, and it was a small town, but he would give her money to go home on. And she turned to me and wanted to borrow three dollars from me, I told her I didn't have it, I had a family to take care of.

"Mr. Blackard: We object to that.

"The Court: Overruled.

"Mr. Embry: Q. And did Mrs. Cobb tell you what she wanted with this money? A. Yes, sir, said she wanted to rent a room with it. I told her I didn't have it.

"Q. I believe you told her it took all you made to keep up your wife and two children? A. Yes, sir.

"Q. How old are those children? A. My boy seven and my girl five.

"The Court: Wanted to rent. a room at what place? A. Didn't say.

"Mr. Embry: Q. About where were you all when this conversation took place? A. I imagine about two and a half miles from the river.

"Q. About two and a half miles from the river? A. Yes, sir.

"Q. What else was said there by Ben? A. Ben told her he would give her the money to go home on when he got to Nashville, and she said she would die before she would go back home.

"Q. Was anything else said by Ben? A. No, sir, that was all, and the first thing I noticed then the door flew open and she jumped out.

"Q. What was her condition as to drunk or sober? A. She had been drinking, but she was sobering up, I couldn't say whether she was drunk or not, she was drinking.

"Q. She had been, but was getting better at that time, you think? A. Yes, sir.

"Q. Who was driving at that time? A. Ben Cassidy.

"Q. Where were you riding? A. I was riding in the, middle of the cab.

"Q. I believe it ·is at this place, it is in the proof here, that it is some eighteen hundred feet west of the toll bridge over the river, the toll house there on the bridge? A. Yes, sir.

"Q. About how fast were you driving at that time? A. About twenty miles an hour I imagine. twenty or twenty-five.

"Q. What was the first thing that attracted your attention? A. The door flew open and she jumped out.

"Q. Which door was that? A. Right hand side door.

"Q. And did she say anything just a second or two before she jumped out? A. No, sir, I don't think she did.

"Q. She had just been talking about going home with Ben and you giving her money? A. Yes, sir.

"Q. What happened when she jumped out of the truck? A. I told Ben to stop, she had jumped out, I had done looked back through the glass and couldn't see her, and he stopped and I got out and went back, seen her lying in the road with her head all mashed in. . . .

"Q. Where did you go to, when you went back to see where she was? A. I probably went back half way the trailer.

"Q. You mean you walked back about half way the trailer? A. Yes, sir.

"Q. Now tell the Court and Jury your best idea of about where her body was lying, this being the pike, this being the right hand margin, this being the left hand margin coming towards Nashville? A. She was lying over close to the right hand side of the paved part of the road.

"Q. On the paved part of the road? A. ·Yes, sir.

"Q. This has a five foot gravel space over there? A. Yes, sir.

"Q. In other words, she was not in that, but she was on the paved road? A. Yes, sir, something I guess about two feet from that.

"Q. Something like two feet? A. Yes, sir.

"Q. Do you know which way her head was? A. The best I remember it was kind of lying crossways of the road, her head was lying towards the outside of the road, right hand side of the road.

"Q. What was the condition of her head? A. It was all mashed in like, all the back of her head was gone, mashed in.

"Q. Was there a hole up there, was it open up there? A. Yes, sir.

"Q. About how much of her head was gone, take your hands and show? A. Probably back this way.

"Q. I will ask you if that was higher on one side than it was on the other? A. I couldn't say exactly.

"Q. Now, when you saw Mrs. Cobb lying there, what did you do? A. I turned and went back to the cab of the truck.

"Q. Where was Ben Cassidy at that time? A. He was still sitting in the cab.

"Q. What happened when you got back there? A. I told him she was dead, the truck had run over her and killed her. Ben commenced screaming.

"Q. Ben commenced screaming? A. Yes, sir.

"Q. What did you do? A. I told him that there was no use of that screaming, it couldn't be helped.

"Q. What happened then? A. I went back to the trailer, back of the trailer, opened those doors, the negroes were in there and they got out.

"Q. What was the condition of Mrs. Cobb's clothes, when she was lying down there on the ground? A. They were turned up.

"Q. They were turned up over her? A. Yes, sir.

"Q. State whether or not you saw a car pass there? A. Yes, sir.

"Q. Which way was the car going? A. Going west.

"Q. Towards Camden? A. Yes, sir.

"Q. Did you know who was in that car? A. No, sir, not at that time.

"Q. You have found out later? A. Yes, sir.

"Q. Who was it? A. Mr. Woodkin or Woodson, I forget his name now.

"Q. I will ask you if that was Mr. Woodson? A. Yes, sir.

"Q. About how long did this Woodson car pass after this tragedy there? A. He passed about the time.

"Q. About the time of it? A. Yes, sir.

"Q. Did you or Ben Cassidy either one take Mrs. Cobb and take her out behind the truck and take a crank or hammer or any blunt instrument and beat her brains out? A. No, sir.

"Q. Did you hurt her in any way? A. No, sir.

"Q. Did you lay your hands on her? A. No, sir.

"Q. Or did Ben Cassidy? A. No, sir.

"Q. When these negroes got out, what was said, Cordell? A. I don't remember just exactly the words that were said, something was said about picking her up and putting her in the truck, and the negroes done so.

"Q. Do you recall who said let's put her in the truck? A. No, sir.

"Q. Why did you do that? A. It scared me, I didn't know what to do.

"Q. Had you ever been in trouble before in your life? A. No, sir.

"Q. Then she was put, first though, had you ever been in any kind of a situation that was anyways similar? A. No, sir.

"Q. Then she was put in the truck? A. Yes, sir.

"Q. What did you boys do then? A. We got in the truck and started on, coming towards the bridge.

"Q. Coming towards Nashville? A. Yes, sir.

"Q. And I believe you all did put her body out over there about McEwen, Tennessee? A. Yes, sir.

"Q. Do you know why you did that? A. No, sir, I don't. It scared me.

"Q. Do you know why you didn't stop there and tell Mr. Rushing or somebody there at the toll bridge? A. No, sir.

"Q. Just didn't? A. No, sir.

"Q. And you came on into Nashville? A. Yes, sir. . . .

"Q. Did you have anything against Mrs. Mary Cobb during her lifetime? A. No, sir.

"Q. Had you ever had any trouble with her? A. No, sir. . . .

"Q. You had the girl, you told the negroes to put the girl in the back end of the truck? A. I don't remember who told them, but they put her in the back end of the truck.

"Q. Somebody told them to? A. Yes, sir.

"Q. You told them? A. I don't remember whether I did or Cassidy, one or the other of us said to.

"Q. Well, she was some twenty or thirty feet back of the truck? A. Yes, sir.

"Q. And you say she had been up there in the front of the truck? A. Yes, sir.

"Q. And the negroes were back in the back of the truck? A. As far as I know, they didn't come up to the cab.

"Q. And Ben didn't sit up there and holler back and tell them to put her in the truck? A. I think so, I told them or he told them, one or the other.

"Q. Wasn't that truck pretty heavily loaded? A. It had on around twenty thousand.

"Q. Twenty thousand what? A. Twenty thousand pounds.

"Q. Wasn't much end at the back end of that truck? A. No, sir.

"Q. It was just a kind of a corner where she was put? A. A space about that wide clear across the back end of the truck there wasn't anything in.

"Q. And she was put in that little corner? A. Yes, sir.

"Q. Goad, when you left there, you went on and crossed the toll bridge? A. Yes, sir.

"Q. You didn't stop this man that passed by? A. No, sir.

"Q. Did you say anything to Rushing up there on the bridge? A. No, sir.

"Q. You knew Rushing, didn't you? A. I know him when I see him, I didn't know his name, I have learned since then.

"Q. You passed there nearly every day? A. Sometimes I would get by there before he came on, I have seen him some few times.

"Q. Then you left the bridge and when you got on the bridge Miss Mary's pocket book was thrown in the river, wasn't it? A. I think so, yes, sir.

"Q. Ben threw it in? A. Yes, sir.

"Q. Cassidy? A. Yes, sir.

"Q. There was a car following behind you, wasn't there? A. I don't know, I never heard anything about any car.

"Q. You had that information, didn't you? A. No, sir.

"Q. That a car was coming behind you on the bridge? A. No, sir.

"Q. Didn't you or Ben, one, ask the negro to look back and see if a car was coming? A. No, sir, never heard anything about it.

"Q. Was anybody down in the river? A. I never saw anybody.

"Q. How is that? A. I never saw anybody.

"Q. But you did throw the pocket book over and went on? A. Ben did, Ben Cassidy threw it over. . . .

"Q. You passed through McEwen or right there at McEwen? A. Yes, sir.

"Q. And then you drove on about six or eight miles the other side of McEwen and there Ben stopped the truck, didn't he? A. Yes, sir.

"Q. And when he stopped the truck, you and the negroes got out? A. Yes, sir.

"Q. And you told the negroes to take her out of the truck? A. I don't remember whether I told them or he told them.

"Q. Or did you take her out yourself? A. No, sir.

"Q. But she was taken out of the truck there? A. Yes, sir.

"Q. Goad, did you catch her by the foot and just pull her out of the truck and let her head and body fall on the hard asphalt? A. No, sir.

"Q. You didn't do that? A. No, sir, never did touch her.

"Q. Did her head and body fall on the hard asphalt? A. I don't remember seeing it if it did.

"Q. Did they pick her up carefully like this and lift her out? A. I don't remember just how they picked her up, but they picked her up and carried her across the road into the woods.

"Q. Did they drag her across the road? A. No, sir.

"Q. You see that big streak of blood there where Mr. Love and two or three others testified to when they found that streak of blood across the highway, and followed that down into the woods? A. I didn't see any blood.

"The Court: Q. Was that in the day or night? A. In the daytime.

"Mr. Blackard: Q. About what time? A. About eight o'clock, I guess.

"Q. At any rate, at your orders the two negroes carried her on down there into the woods? A. Whichever one told them to, I don't remember whether I did or not.

"Q. After they carried her on down there, the negroes came on back to the truck? A. Yes, sir.

"Q. You asked them had they covered her up? A. I think Cassidy asked them that.

"Q. And they said no, and you told Frank to go back and cover her up? A. I didn't tell him, I don't know what he done.

"Q. You don't know whether he did that voluntarily or not? A. I don't know what he done, if he went down there.

"Q. Then you all came back and got in the truck and started on again? A. Yes, sir. . . .

"Q. Mr. Goad, those two negroes who were on the truck, Jesse Brown and Frank Simmons, they didn't have anything to do with the death of this girl at all, did they? A. No, sir.

"Q. Not a thing in the world? A. No, sir."

The testimony of defendant Ben Cassidy, relating to the trip from Memphis to Nashville on June 20th and 21st, and the manner in which Mary Royer Cobb lost her life, is, in its material aspects, substantially the same as that of defendant Goad heretofore stated.

It is obvious that there was evidence before the jury upon which to base a finding that plaintiff's intestate was willfully murdered by defendant Goad; but the question for decision is whether defendant Hoover Company is liable in damages for the willful tort of its servant, Goad, under the circumstances disclosed?

Mary Royer Cobb was not a "passenger" on the truck of defendant Hoover Company, within the legal meaning of that term, and was not entitled to the degree of protection at the hands of the Hoover Company which the law demands of a passenger—carrier toward its passengers. The plaintiff's theory below, as stated in the court's charge to the jury (to which charge there was no objection by plaintiff), was that Mary Royer Cobb was a licensee on defendant's truck. This would, of course, exclude the theory that she was a "passenger."

But whether, upon all the facts disclosed by the record, plaintiff's intestate was a licensee or a trespasser on the Hoover truck at the time she lost her life, is a question about which the authorities are not in harmony. 4 R. C. L., p. 1015; 42 C. J., pp. 1101, 1102; Louisville & N. R. Co. v. Hailey, 94 Tenn., 383, 29 S. W., 367, 27 L. R. A., 549; Illinois Cent. R. Co. v. Meacham, 91 Tenn., 428, 431, 19 S. W., 232; Morris v. City, etc., Taxi Co., 220 Ky., 219, 294 S. W., 1030; L. & N. R. Co. v. Hadley, 11 Tenn. App., 646; Sou. Pac. Railroad Co. v. Schuyler, 227 U. S., 601, 33 S. Ct., 277, 57 L. Ed., 662, 43 L. R. A. (N. S.), 901; Chicago, R. I. & P. R. Co. v. Maucher, 248 U. S., 359, 39 S. Ct., 108, 63 L. Ed., 294; Bjornquist v. Railroad (C. C. A.), 250 Fed., 929, 5 A. L. R., 951; Morris v. Fruit Co., 32 Ga. App., 788, 124 S. E., 807; Monnet v. Ullman, 129 Or., 44, 276 Pac., 244; O'Leary v. Fash, 245 Mass., 123, 140 N. E., 282.

A multitude of additional authorities might be cited, but we think the foregoing will suffice to disclose the divergent views of the courts upon the question just stated.

However, we do not think it is material to determine whether plaintiff's intestate was a licensee or a trespasser on defendant Hoover Company's truck, for, in either case, the defendant owed her the duty to not wantonly or willfully injure her; and, as the jury must have found that she was willfully slain by defendant Goad, it is necessary to determine whether the willful act of Goad was the act of his employer, the defendant Hoover Company.

If the act of a servant is done in the execution of the authority given him by the master and for the purpose of performing what he was directed to do, the master is responsible whether the wrong done be occasioned by negligence or by a wanton, willful purpose to accomplish his business in an unlawful manner; but if the servant or agent does a wrongful act without authority, and not for the purpose of executing the orders or doing the work of his master, the latter is not responsible therefor. Ciarmataro v. Adams, 275 Mass., 521, 176 N. E., 610, 75 A. L. R., 1171; Deihl & Lord v. Ottenville, 14 Lea, 191, 196; Druffenbroch v. Lawrence, 7 Tenn. Civ. App., 405; Foster-Herbert Cut Stone Company v. Pugh, 115 Tenn., 688, 692, 91 S. W., 199, 4 L. R. A. (N. S.), 804, 112 Am. St. Rep., 881; Hunt-Berlin Coal Co. v. Paton, 139 Tenn., 611, 202 S. W., 935; Kennedy v. Union Charcoal & Chemical Co., 156 Tenn., 666, 4 S. W. (2d), 354, 57 A. L. R., 733; Life & Casualty Insurance Co. v. Russell, 164 Tenn., 586, 51 S. W. (2d), 491; Woody v. Ball, 5 Tenn. App., 300; 2 Blashfield's Ency. of Automobile Law, pp. 1380, 1381, and 1389; Morris v. Fruit Co., supra.

"An act done by a servant while engaged in his master's work, but not done as a means or for the purpose of performing that work, is not to be deemed the act of the master." Fairbanks v. Boston

Storage Warehouse Co., 189 Mass., 419, 75 N. E., 737, 13 L. R. A. (N. S.), 422, 423, 109 Am. St. Rep., 646.

The case of Fairbanks v. Boston Storage Warehouse Co., supra, was cited with approval by our Supreme Court in the case of Hunt-Berlin Coal Co. v. Paton, supra.

"It is not, as a general rule, within the scope of the servant's employment to commit an assault upon a third person, and the master is not liable for such an assault, though committed while the servant was about his master's business." 3 Cooley on Torts (4 Ed.), pp. 78, 79. The question is, therefore, was the servant "seeking to accomplish his master's purpose?" Wolf v. Terminal Railroad Association, 282 Mo., 559, 222 S. W., 114.

"Obviously to make the master liable for the servant's tort, it must be committed in a negligent or wanton and reckless manner in the execution or accomplishment of the business of the master. Schoul. Dom. Rel., 636. If the servant step aside from his employment, that is, abandon it for the time being, to commit a tort not within the course or scope of his employment, the master is not liable. We do not understand that it is necessary, within the meaning of that term, that he should literally and physically 'step aside' from the locus in quo; he is serving his master in the performance of his legitimate duties before he can abandon or 'step aside' from that service and commit a tort not within the scope of his employment. But where the wrong is done wholly for his own purpose, disconnected from the execution of his master's orders, the servant and not the master is liable. He has 'stepped aside' from the course or scope of his employment." Deihl & Lord v. Ottenville, supra, page 198 of 14 Lea.

The above-quoted statement of law from the opinion in Deihl & Lord v. Ottenville is quoted with approval in the recent case of Life & Casualty Insurance Co. v. Russell, supra, page 589 of 164 Tenn., 51 S. W. (2d), 491.

"If the servant goes outside of the scope of his employment, and, to serve some purpose of his own, does a wanton or malicious act to the injury of another, the master is not liable." Terry v. Burford, 131 Tenn., 451, 468, 175 S. W., 538, 542, L. R. A., 1916F, 714.

"The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is: Was the act done by virtue of the employment and in furtherance of the master's business?" 3 Cooley on Torts (4 Ed.), pp. 68, 69; Acc. American Railway Express Co. v. Mackley, 148 Ark., 227, 230 S. W., 598.

The averment of the amendment to the declaration (made after verdict and judgment) that Goad and Cassidy killed plaintiff's intestate in an effort to eject her from said truck, and/or while ejecting her from said truck, finds no support in the evidence. Such a theory would be mere speculation, and a verdict cannot be based on con-

jecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 242 S. W., 646; Chicago, etc., Railway Co. v. Coogan, 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed., 1041, 1045.

We find no evidence in the record which reasonably tends to show that Goad assaulted plaintiff's intestate to accomplish any purpose in the furtherance of the business or the interests of defendant Hoover Company. If Mary Royer Cobb lost her life in the manner stated by Goad and Cassidy in their testimony, of course defendant Hoover Company is not liable. If she was killed in the manner and under the circumstances shown by the plaintiff's witnesses, she was wantonly, willfully, and maliciously murdered by Goad acting in his personal capacity, wholly disconnected from any purpose or effort to further his employer's business, and defendant Hoover Company should not be held to respond in damages therefor. Deihl & Lord v. Ottenville, supra; Druffenbroch v. Lawrence, supra; Woody v. Ball, supra; Life & Casualty Insurance Co. v. Russell, supra. And the motion made at the close of all the evidence for peremptory instructions on behalf of the Hoover Company should have been sustained. Hunt-Berlin Coal Co. v. Paton, supra; Druffenbroch v. Lawrence, supra; Woody v. Ball, supra.

The defendant Hoover Company's second and third assignments of error are sustained.

Six of the defendant Hoover Company's assignments of error complain of the charge of the court to the jury, and five other assignments complain of the refusal of the trial court to give the jury instructions requested by the Hoover Company.

Another assignment (the sixth) is that "the Court erred in permitting the plaintiff to introduce testimony tending to show this defendant carried insurance."

And the remaining assignment is that "the verdict is so excessive as to show passion, caprice and prejudice."

The sixth assignment, supra, does not conform to the rules of this court governing assignments of error, which rules require that "when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of record where the evidence and ruling may be found." Appendix to 155 Tenn., p. XII, rule 11, subsec. 3.

In view of our holding under the second and third assignments of error that the jury should have been instructed to return a verdict in favor of defendant Hoover Company, it is obvious that the remaining assignments of error are now immaterial, and their consideration may be pretermitted.

It results that, as against the defendant Hoover Motor Express Company, Inc., the judgment of the circuit court is reversed, the verdict of the jury is set aside, and the plaintiff's suit is dismissed.

The costs of the appeal will be adjudged against the plaintiff administrator.

Crownover and DeWitt, JJ., concur.